IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| LAURIE ANN HENSLEY, | : | Case No. 1:17-cv-190 |
| | : | |
| Plaintiff, | : | Judge Susan J. Dlott |
| | : | |
| v. | : | **ORDER GRANTING DEFENDANTS'** |
| | : | **MOTIONS FOR SUMMARY** |
| PETERMANN LTD., *et al.*, | : | **JUDGMENT** |
| | : | |
| Defendants. | : | |
| | : | |

This matter is before the Court on Motions for Summary Judgment by Defendant Great Oaks Education Foundation (Doc. 28) and Defendant Petermann LTD (Doc. 40). Appropriate responses and replies have been filed (Docs. 33, 34, 43, 44, 47). For the reasons that follow, the Defendants' Motions for Summary Judgment will be **GRANTED**.

## I. BACKGROUND

### A. Facts[1]

Plaintiff Laurie Ann Hensley began working as a substitute school bus driver for Defendant Petermann Ltd. ("Petermann") assigned to the Monroe School District in 2000. Defendant Great Oaks Education Foundation ("Great Oaks") provides career training and economic development services at four campuses, including Scarlet Oaks. Great Oaks contracted with Petermann to provide school bus drivers to transport students to daily classes as well as field trips and other extra-curricular activities. Pursuant to the contract between Great Oaks and Petermann, "Drivers, upon request, will perform light custodial/cafeteria food service

---

[1] The facts in this matter are largely undisputed. Where there are potential disputes, the Court will rely on Hensley's deposition testimony.

1

duties while they are waiting to transport students to or from a particular location; provided that these duties do not conflict with the transportation needs of . . . the students." (Agreement, Doc. 26-2 at PageID 540.)

In 2003, Hensley suffered a serious, non-work-related back injury. She returned to work in August, 2003, but she was medically prevented from lifting more than 40 pounds. (Hensley Dep., Doc. 22 at PageID 168.) Petermann accommodated Hensley's restriction. (*Id.* at PageID 174.)

In 2007, Hensley injured her back attempting to secure a student's wheelchair inside the bus. (*Id.* at PageID 180–181.) After this injury, doctors imposed a 10-pound lifting restriction. (*Id.* at PageID 184.) Again, Petermann honored Hensley's restriction. (*Id.* at PageID 186.)

In 2009, Hensley successfully bid on an open route at Great Oaks because it offered more work hours. (*Id.* at PageID 191.) She worked nine hours per day and was paid for a tenth hour of travel time five days per week. (*Id.* at PageID 195.)

Upon returning from Christmas break in 2010, Hensley and other Petermann drivers assigned to Great Oaks were told they would now be required to assist with light custodial work during the day when they were not driving. (*Id.* at PageID 198–99.) Hensley reported to the Instructional Resource Center ("IRC")—an administrative office building—where she would spot sweep floors, wipe tables in the employee break room, and stock the ladies' room with paper products. (*Id.* at PageID 202, 205–06.) She performed these tasks without incident for six years.

However, in 2016, Hensley's work assignment changed. Great Oaks closed the IRC, and Hensley learned she would be joining other Petermann drivers in the Scarlet Oaks school building. (*Id.* at PageID 214–15.) Hensley protested that the custodial duties her co-workers

2

performed at the school building conflicted with her medical restrictions. (*Id.* at PageID 215–16.) At her supervisor's suggestion, Hensley informed the custodian at Scarlet Oaks about her back-related limitations. (*Id.* at PageID 216–17.)

Initially, Defendants assigned Hensley to work on the adult education side of the building where a regular custodian was on leave. To accommodate her medical restrictions, another custodian completed tasks requiring heavy lifting. (*Id.* at PageID 218–19.) However, after a few weeks, Hensley was reassigned to the high school side of the building, where she would be required to serve food, clean the cafeteria, and stack tables and chairs. (*Id.* at PageID 219–220.) She complained about the reassignment to supervisory employees at Great Oaks, but her Petermann supervisor, Ray Brock, instructed her to come to him regarding assignments and accommodations. (*Id.* at PageID 221.) Hensley told Brock that she physically could not perform the tasks required on the high school side of the building, and Brock replied that "he would take care of it." (*Id.* at PageID 222.) Brock requested another copy of her medical restrictions, and shortly after she provided it, Brock informed her that it had nothing to do with her bus driving abilities but she was no longer needed at Great Oaks. (*Id.* at PageID 223–25.)

With no other available choice, Hensley returned to working as a substitute bus driver in the Monroe School District. (*Id.* at PageID 226.) A few days later, a grades-two-through-twelve route came open in Monroe, and Hensley successfully bid on it. (*Id.* at PageID 227–28.) Since assuming the regular Monroe route, Hensley transports students to and from school and averages four to five field trips per week. (*Id.* at PageID 229.) With the exception of a five-month period in which she volunteered to drive school buses for Petermann in Chattanooga, Tennessee, Hensley continues to drive the 25-hours-per-week Monroe route plus field trips. (*Id.* at PageID 229–31.) Petermann pays her $20.57 per hour for routes and $14.68 per hour for field trips. (*Id.*

3

at PageID 231.) Her medical restrictions are being accommodated. (*Id.* at PageID 242.) Even though a particular bus typically stays with the route rather than the driver, Petermann allowed Hensley to choose her bus for the Monroe route because it was "better for [her] back." (*Id.* at PageID 243–44.)

### B. Procedural Posture

Hensley initiated this action alleging claims for violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), intentional infliction of emotional distress, and violations of §§ 501 and 504 of the Rehabilitation Act of 1973. Defendant Great Oaks moved for summary judgment on the bases that it is not Hensley's employer and that Hensley was not discriminated against because of her disability (Doc. 28). Defendant Petermann moved for summary judgment contending that it accommodated Hensley's disability; she did not suffer an adverse employment action; she was not discriminated against because of her disability; and the Rehabilitation Act does not apply because Petermann does not receive federal funding (Doc. 40). Hensley opposes both motions.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317,

322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

### III. ANALYSIS

The Court will first address Plaintiff's federal claims and then address her state law claim.

#### A. Plaintiff's ADA Claim

The ADA, as amended, provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and

5

other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Discrimination" is defined to include "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(b)(5)(B).

In the absence of direct evidence of discrimination, the familiar burden-shifting scheme of *McDonnell Douglas* applies to disability discrimination claims. *Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 444 (6th Cir. 2018); *Whitfield v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011). A disability discrimination plaintiff must establish the following elements of a *prima facie* case:

> (1) [H]e or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Barlia*, 721 F. App'x at 444 (quoting *Whitfield*, 639 F.3d at 259); *see also Ferrari v. Ford Motor Co.*, 826 F.3d 885, 894 (6th Cir. 2016).

Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. "If the defendant meets this burden of production, the plaintiff must introduce evidence showing 'that the proffered reason was not the true reason for the employment decision.'" *Barlia*, 721 F. App'x at 445 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993)). "Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Blizzard v. Marion Tech. College*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). The

6

plaintiff must "produce sufficient evidence from which the fact finder could reasonably infer that the asserted unlawful discrimination or retaliation was the real reason." *Bailey v. Oakwood Healthcare, Inc.*, 732 F. App'x 360, 362 (6th Cir. 2018); *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012).

In this case, the parties agree that: (1) Hensley is disabled; (2) Defendants knew about her disability; and (3) another driver was assigned the Great Oaks route after Hensley was reassigned to Monroe. Defendants contend that Hensley is unable to establish a *prima facie* case of disability discrimination because she is not otherwise qualified for the position and because she did not suffer an adverse employment decision. The Court will address the adverse employment decision issue first.

### a. Adverse Employment Action

"Not every act affecting an individual's employment can be considered an adverse employment action." *McMillian v. Potter*, 130 F. App'x 793, 796 (6th Cir. 2005). For example, "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Id.* (quoting *Kocsis v. Multi-Care Mgmt. Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)). Instead:

> Such a change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007) (quoting *Ford v. Gen. Motors Co.*, 305 F.3d 545, 553 (6th Cir. 2002)).

7

In the case at bar, Hensley was reassigned from Great Oaks to Monroe as a substitute driver. Because of her seniority, she was given priority over every other substitute driver and was able to bid on a route and become a full-time driver again within two weeks. (Doc. 38 at PageID 620; Doc. 22 at PageID 227.) According to Hensley, although her hourly rate remained the same, she was paid for 50 hours per week at Great Oaks but only 25 hours per week as a route driver at Monroe.[2] (Doc. 22 at PageID 195, 231.) While she could drive field trip buses during the day for extra income at Monroe, field trips pay almost six dollars less per hour than regular routes pay. (*Id.* at PageID 231.) Thus, according to Hensley, her total income decreased significantly as a result of her transfer from Great Oaks to Monroe.[3] For summary judgment purposes, then, Hensley has offered enough evidence to establish a genuine issue of material fact that she suffered an adverse employment action.

### b. Otherwise Qualified

To demonstrate that she is otherwise qualified for the position, "an employee must show that she can perform the essential functions of a job with or without an accommodation. 'A job function is essential if its removal would fundamentally alter the position.'" *Hostettler v. College of Wooster*, 895 F.3d 844, 854 (6th Cir. 2018) (quoting *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018)). ADA regulations offer several non-exclusive factors to consider in determining which job functions are "essential," including:

---

[2] Petermann alleges that "once [Hensley] became a full-time driver she was guaranteed eight hours for each day." (Tate Dec., Doc. 38 at PageID 620.) For summary judgment purposes, the Court will credit Hensley's deposition testimony to the extent it conflicts with other evidence.
[3] Petermann counters that Hensley's total income remained basically the same in that she earned $37,852.47 in 2015; $27,836.24 in 2016 (the year in which she was reassigned from Great Oaks to Monroe); $38,505.33 in 2017; and is on pace to earn $35,184 in 2018. (Gillen Dec., Doc. 39-1 at PageID 530.) However, the Court accepts Hensley's factual evidence as true for summary judgment purposes. In addition, there is evidence that Hensley's 2017 earnings were inflated by her six-month assignment in Chattanooga, Tennessee, during which she "got a lot more hours." (Doc. 22 at PageID 314.)

> (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions . . .; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

*Green v. BakeMark USA, LLC*, 683 F. App'x 486, 492 (6th Cir. 2017) (quoting 29 C.F.R. § 1630.2(n)(3)).

In this case, the contract between Petermann and Great Oaks required bus drivers to perform light custodial or cafeteria duties when they were not transporting students. (Agreement, Doc. 26-2 at PageID 540.) Hensley was able to perform the much lighter tasks required at the IRC (an office facility). However, once the IRC closed, Hensley worked at the Great Oaks school building. At the school building, Hensley admits that she could not pull commercial trash bags, wax floors, or similar tasks. (Doc. 22 at PageID 218.) She could not stack cafeteria chairs or break down lunch tables. (*Id.* at PageID 318–19.) She could not mop the cafeteria floor, serve the food, carry containers of food to the serving area, or scrub woodwork. (*Id.* at PageID 219–220; 319–20.)

Defendants tried to accommodate her medical needs by asking her to walk the building and do light sweeping and dust windows, but she asked them to "knock it back a notch." (*Id.* at PageID 321.) Supervisors from Great Oaks and Petermann attempted to identify additional accommodations, but "there were no available custodial positions where Hensley could have tasks any less strenuous than those she was already performing." (Tate Dec., Doc. 38 at PageID 619.) She acknowledges that the other drivers at Great Oaks stacked chairs, pulled trash bags, broke down tables, mopped floors, and carried pans of food. (Doc. 22 at 322–323.) She approached her supervisor and "told him what was being asked of [her] and that [she] could not

9

perform those duties physically." (*Id.* at 222, 323.) Thus, by her own admission, she could not perform the essential functions required at Great Oaks, even with an accommodation. Accordingly, Hensley cannot establish a *prima facie* case of disability discrimination.

In addition, even if Plaintiff could establish a *prima facie* case of disability discrimination, Defendants have stated a legitimate nondiscriminatory reason for transferring Hensley from Great Oaks to Monroe, i.e., to accommodate her stated medical needs. After the IRC closed, Defendants attempted to devise a position requiring the lightest possible custodial duties for Hensley, but she informed Defendants that she was physically unable to perform even those tasks. In an effort to accommodate Hensley, Defendants transferred her back to Monroe where she would be required only to drive a school bus, a task that the record indicates she does quite well. The record is absolutely devoid of evidence that the stated reason is pretextual, and the Plaintiff has failed to identify any such evidence.

### B. Plaintiff's ADA Accommodation Claim

The ADA's prohibition against "discriminat[ing] against a qualified individual on the basis of disability" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). To prevail on a failure-to-accommodate claim, a plaintiff must establish: (1) she is disabled within the meaning of the ADA; (2) she is otherwise qualified for the position; (3) the employer knew or had reason to know of the disability; (4) the employee requested an accommodation; and (5) the employer failed to provide the reasonable accommodation. *Green*, 683 F. App'x at 491. "[I]f the

employee never requests an accommodation, the employer's duty to engage in the interactive process is never triggered." *Melange v. City of Center Line*, 482 F. App'x 81, 85 (6th Cir. 2012).

The Court concluded above that Hensley is not "otherwise qualified" for the position of bus driver at Great Oaks because Great Oaks required custodial and/or cafeteria work that Hensley is unable to perform. For that reason alone, her failure-to-accommodate claim must fail. However, even if she could establish that she is "otherwise qualified," she has offered no evidence that she ever requested an accommodation that Defendants were unwilling to make.

After Hensley's back injury, she informed her supervisor that she was unable to lift the bus hood to check fluid levels. He "told [her] it would be no problem, he would take care of it for [her]." (Hensley Dep., Doc. 22 at PageID 197.) She asked her supervisor if he would install a new, more comfortable driver's seat on her bus if she purchased the seat. He responded, "[N]o, I'll just buy a seat for you." (*Id.* at PageID 203.) He then bought and installed the more comfortable seat for her. (*Id.*)

In December 2010, Great Oaks contracted with Petermann to have Petermann employees perform light custodial and cafeteria duties while they were waiting to transport students to various locations. Hensley was assigned to the IRC, a small office building where she wiped the breakroom tables, swept floors, and stocked the ladies' room with paper goods. (*Id.* at PageID 205–06.) Her supervisor specifically told her "not to do anything [at the IRC] that would bother [her] back." (*Id.* at PageID 206.) For approximately six years, Hensley continued to drive her bus and engage in light custodial duties at the IRC without incident. (*Id.* at PageID 210.)

However, the IRC closed in 2016, and Hensley was reassigned to the much larger school building. (*Id.* at PageID 214.) Hensley informed her supervisor that she would not be able to pull commercial trash bags so "[t]hey sent a custodian over to pull the trash bags for [her]." (*Id.*

at PageID 218.) When Hensley informed her supervisor that she could not stack cafeteria chairs or break down cafeteria tables, she was not required to perform those duties. (*Id.* at PageID 321.) When she told her supervisor she was unable to carry bins of food to the serving area or use the heavy commercial mop, he removed her from those duties and asked her to walk the building and spot sweep and dust windows and "do what [she] could do in the cafeteria." (*Id.* at PageID 320–321.) When Hensley returned to the Monroe facility, she asked to retain the bus with the more comfortable seat, and again Defendants accommodated her request. (*Id.* at PageID 337.)

Hensley does not identify anywhere in her deposition an accommodation she requested that was not granted. In responding to Defendants' motions for summary judgment, Hensley's attorney suggests that Petermann should have returned her to the light custodial tasks she performed at the IRC (which no longer exists), assign her to a different school district (even though there is no evidence that Hensley was ever denied a route on which she bid), or assign her to "other posts like dispatcher and other like supervisory posts" (promotions for which there is no evidence Hensley ever applied). (Doc. 44 at PageID 694–94.) Accordingly, there is no evidence that Hensley ever requested an accommodation that was denied to her, and Defendants are entitled to summary judgment on her ADA failure-to-accommodate claim.

### C. Plaintiff's Rehabilitation Act Claim

"By statute, the Americans with Disabilities Act standards apply in Rehabilitation Act cases alleging employment discrimination." *Burns v. City of Columbus, Dep't of Pub. Safety, Div. of Police*, 91 F.3d 836, 842 (6th Cir. 1996). As the Court has concluded that Defendants are entitled to summary judgment on Plaintiff's ADA claims, the Defendants are also entitled to summary judgment on Plaintiff's Rehabilitation Act claims. Therefore, the Court need not

address Defendants' contention that the Rehabilitation Act does not apply to them because they do not receive qualifying federal funding.

### D. Plaintiff's Claim for Intentional Infliction of Emotional Distress

The Ohio Supreme Court recognized the tort of intentional infliction of serious emotional distress in *Yeager v. Local Union 20*, 6 Ohio St. 3d 369, 453 N.E.2d 666, 670–71 (1983). Based on its reading of *Yeager*, the Sixth Circuit reduced the standard into these four elements: "(1) defendants intended to cause emotional distress, or knew or should have known that their actions would result in plaintiff's serious emotional distress, (2) defendants' conduct was extreme and outrageous, (3) defendants' actions proximately caused plaintiff's emotional injury, and (4) plaintiff suffered serious emotional anguish." *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995) (citations omitted).

The Court will focus on the second make-or-break element of the *Yeager* standard. Without evidence of conduct that is extreme and outrageous, Defendants are entitled to summary judgment.

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Yeager*, 453 N.E.2d at 671 (quoting Restatement (Second) of Torts § 46(1) cmt. D (1965)). "[T]o say that Ohio courts narrowly define 'extreme and outrageous conduct' would be

13

something of an understatement." *Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 633 (6th Cir. 2009) (quoting *Baab v. AMR Servs. Corp.*, 811 F. Supp. 1246, 1249 (N.D. Ohio 1993)). The Sixth Circuit has explained that "an employee's termination, even if based upon discrimination, does not rise to the level of 'extreme and outrageous conduct' without proof of something more." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999);[4] *Benge v. General Motors Corp.*, 267 F. Supp. 2d 794, 805 (S.D. Ohio 2003).

In the case at bar, Plaintiff failed to unearth a single fact that would rise to the level of "extreme and outrageous conduct" required to state a claim for intentional infliction of emotional distress. Indeed, Plaintiff did not even bother responding to Defendant Petermann's Motion for Summary Judgment on her emotional distress claim. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim for intentional infliction of emotional distress.

**IV. CONCLUSION**

For the foregoing reasons, the Motions for Summary Judgment filed by Defendant Great Oaks Education Foundation (Doc. 28) and Defendant Petermann LTD (Doc. 40) are hereby granted. This matter is terminated from the docket.

**IT IS SO ORDERED**.

Dated: November 5, 2018   S/Susan J. Dlott_____
                                                 Judge Susan J. Dlott
                                                 United States District Court

---

[4] If this were not true, *every* discrimination claim *automatically* would become a claim for intentional infliction of emotional distress. *Godfredson,* 173 F.3d at 376.